# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| VEOLIA WATER NORTH AMERICA OPERATIONS SERVICES, LLC, | ) ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) ) | Case No.: 2:15-cv-02073-JEO |
| v. | ) ) | |
| SSAB ALABAMA, INC., | ) ) | |
| Defendant/Counter-Plaintiff. | ) | |

## MEMORANDUM OPINION

This litigation began in November 2015, when Plaintiff/Counter-Defendant Veolia Water North America Operations Services, LLC ("Veolia") sued Defendant/Counter-Plaintiff SSAB Alabama, Inc. ("SSAB") for its alleged anticipatory breach of a Process Water Agreement (the "Agreement") under which Veolia owned and operated a process water facility that serves a steel mill owned by SSAB.[1] (Doc. 1).[2] Currently before the court is Veolia's motion for summary judgment with respect to SSAB's remaining counterclaims. (Doc. 130). The

---

[1] Veolia was formerly U.S. Filter Operating Services, Inc., and SSAB was formerly IPSCO Steel (Alabama), Inc. (Doc. 1 at ¶ 1). To avoid confusion, the court refers to both Veolia and U.S. Filter Operating Services as "Veolia" and will refer to both SSAB and IPSCO Steel (Alabama) as "SSAB."

[2] References to "Doc. __" are to the documents numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files (CM/ECF) system.

motion has been fully briefed, (docs. 131, 135, 136), and is now ripe for decision. For the following reasons, the court[3] concludes that the motion is due to be granted.

## I. PROCEDURAL HISTORY

In its complaint, Veolia alleged that SSAB exercised its contractual option to terminate the Agreement and take title to the process water facility, but indicated its intent not to pay Veolia a $6 million termination fee required under the Agreement. (Doc. 1). Veolia sought an order directing SSAB to pay the $6 million termination fee. (*Id*.). SSAB answered the complaint and expressly denied any breach or anticipatory repudiation of the Agreement. (Doc. 21). SSAB also counterclaimed against Veolia, requesting a declaratory judgment that it was entitled to a set-off against the termination fee due to Veolia's alleged inability and failure to perform under the Agreement. (*Id.*)

On December 18, 2015, the court entered a consent order requiring SSAB to pay the $6 million termination fee to Veolia and requiring Veolia to post a $6 million surety bond to protect SSAB in the event it proved a right and entitlement to a set-off under the Agreement. (Doc. 39). The consent order also provided that "[t]he payment of the $6 million Termination Fee by SSAB, the posting of the Bond by Veolia, and the transfer of [the process water facility] to SSAB shall be

---

[3] The parties have consented to an exercise of plenary jurisdiction by a magistrate judge, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Doc. 25).

without prejudice to any claim, defense or right of any party . . . all of which shall be reserved." (*Id.* at ¶ 4). SSAB paid the termination fee on December 31, 2015, and Veolia posted the surety bond as ordered. (*See* Doc. 40).

SSAB subsequently filed an amended counterclaim against Veolia. (Doc. 58). In its amended counterclaim, SSAB alleges that Veolia owes it "at least $11,363,335.00" for the additional costs SSAB incurred as a result of Veolia's alleged "inability and failure to properly regulate and treat" the water generated by SSAB's steel mill. (*Id.* at ¶ 4). The amended counterclaim contains claims for negligence, breach of contract, breach of warranty/guarantee, and declaratory judgment. (*Id.* at 3-7).

Shortly after answering the amended counterclaim, (doc. 67), Veolia moved for summary judgment on the amended counterclaim, advancing seven separate arguments[4] for why summary judgment should be granted in its favor. (Docs. 68 & 71). In response, SSAB conceded that its claim for negligent breach of contract was due to be dismissed. (*See* Doc. 89 at 17). Additionally, upon agreement of the parties, the court decided to address four of the remaining six arguments and

---

[4] Veolia's arguments were as follows: (1) SSAB's contract claims are barred because SSAB failed to provide Veolia with notice of default and an opportunity to cure as required by the Agreement; (2) SSAB's claims are barred by a 2003 settlement and release and a 2003 amendment to the Agreement; (3) SSAB's claims are barred under the doctrines of voluntary payment, accord and satisfaction, and waiver; (4) SSAB's claim for negligent breach of contract fails as a matter of law; (5) SSAB's claims are barred by the applicable statutes of limitation; (6) SSAB has no right to a set-off against the $6 million termination fee paid by SSAB and covered by Veolia's surety bond; and (7) the terms of the Agreement preclude SSAB from recovering any damages relating to waste disposal costs.

hold two arguments in abeyance to be renewed after discovery. (Docs. 93, 97). As for the four arguments addressed by the court, the court granted the motion as to the negligence claim and claim for declaratory judgment. (Docs. 97-98). The court also granted the motion to the extent that the amended counterclaim sought the recovery of damages relating to waste disposal costs. (*Id.*). The court denied summary judgment on the other two grounds and specifically allowed Veolia to reassert its remaining arguments at a later time. (*Id.*). That time is now.[5]

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a party is authorized to move for summary judgment on a claim or defense asserted by or against the movant. Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "Disposition of a summary judgment motion in a declaratory judgment action is governed by the same basic principles that generally rule the grant or denial of such a motion." *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984).

---

[5] In the meantime, upon consent of both parties, the court released Veolia from its December 18, 2015 order requiring it to post a surety bond. (Docs. 103, 104). The release of the bond was without prejudice to any party's claim or right of recovery of any and all costs associated with the posting and filing of the bond, including the premiums for the bond and attorneys' fees as may be allowed by the Agreement or applicable law. (Doc. 104).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Where the movant will not bear the burden of proof on a claim or issue at trial, the movant can satisfy that burden by pointing to specific portions of the materials on file that either negate an essential element of the non-movant's claim or that affirmatively indicate "that the party bearing the burden of proof at trial will not be able to meet that burden." *Clark*, 929 F.2d at 608; *see also United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1438 n. 19 (11th Cir. 1991). By contrast, when the moving party has the burden of proof at trial, it must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. *See Four Parcels*, 941 F.2d at 1438. "In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Id*.

Once the moving party has met its initial burden, the nonmoving party must "go beyond the pleadings" and refer the court to evidence demonstrating that there

is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324. In its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *See Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III. FACTUAL BACKGROUD[6]

In 1999, SSAB began construction of a steel mill in Mobile County, Alabama. In July 1999, while the mill was under construction, SSAB and Veolia entered into the Agreement, pursuant to which Veolia agreed to construct a process water facility (the "Facility") to treat the water that would be circulated and discharged during the production of steel at the mill. (Agreement § 3).[7] The Agreement provided that Veolia would own the Facility and would "operate, maintain and repair" the Facility so as to provide SSAB with treated water meeting certain specifications. (*Id.* §§ 2.4-2.5, 6.1(1)(a)). SSAB was responsible for "[t]he

---

[6] These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[7] The Agreement is located at Docs. 132-1 & 132-2. Citations are to the page numbers and sections of the Agreement itself, not to the electronic numbers assigned by the Clerk of the Court.

costs of all off-site treatment and disposal of solid or other waste produced by the … Facility." (*Id.* § 4.4(2)).

## A. Rolling Mill Contact Cooling Water System

SSAB's counterclaims involve Veolia's treatment of process water from SSAB's rolling mill contact cooling water system. In the rolling mill, contact cooling water is sprayed at high pressure onto the steel slabs to remove mill scale[8] from their surfaces and then circulated through various parts and equipment in the rolling mill to cool the slabs. (Deposition of Scott Kelley on 8/16/18 ("Kelley Dep. I") at 63-64).[9] Afterwards, the rolling mill's contact cooling water goes to the process water facility so it can be treated. Water that contains mill scale exits the rolling mill through a flume. (*Id*. at 70). The water then enters a pre-sedimentation pit where the heaviest solids settle out of the water. (*Id*. at 70-71; Schubert Dep. at 51). The water is pumped from the pre-sedimentation pit into two secondary pits where smaller solids settle out.[10] (Kelley Dep. I at 72; Schubert Dep. at 52). From that point, the water collects in the secondary pit "hot well"

---

[8] Mill scale includes small pieces of steel, as well as fine iron oxide particles. (Deposition of John Schubert ("Schubert Dep.") at 50-51). The deposition of John Schubert is located at Doc. 132-4.

[9] The deposition of Scott Kelley taken on 8/16/18 is located at Doc. 132-3.

[10] At various points throughout the treatment process, chemicals are added to the water. Specifically, chemicals are added to bring the finer solids together so they will either settle out in the secondary pits or become easily captured by the filters. (Deposition of John Wesselman ("Wesselman Dep.) at 73-74). The deposition of John Wesselman is located at Doc. 132-5

where it is pumped by three pumps, collectively called the "612 pumps," to a header which distributes the water to ten pressure filters. (Kelley Dep. I at 73, 267). The water flows from the top of the filter through sand and gravel media that further collect fine solids from the water. (Schubert Dep. at 148-49). The resulting water is then pumped to cooling towers where the cooled water is collected in a cold well and then either pumped back to the rolling mill for reuse or discharged to the Mobile River. (Kelley Dep. I at 74; *see also* Agreement §1.1).

## B. Early Disputes Resulting in Settlement and Agreement Amendment

The steel mill and the Facility began operations in 2001. (Doc. 12 ¶ 22). Shortly thereafter, disputes arose between the parties. Among other issues, Veolia asserted a claim against SSAB for certain costs it had incurred during the construction of the Facility and a claim for increased operation and maintenance costs. SSAB, in turn, claimed that Veolia had failed to meet the requirements of the Agreement with respect to the provision of treated water.

On December 10, 2003, the parties entered into a settlement agreement and mutual general release (the "2003 Release").[11] In relevant part, the 2003 Release released Veolia from "any and all manner of claims . . . whether accrued or hereafter maturing . . . resulting from . . . any act, omission, statement, promise, covenant, contract, breach of contract, tort, cause, matter or thing whatsoever

---

[11] The 2003 Release is located at document 132-7

occurring or existing from the beginning of time to the date hereof arising out of or relating to the Agreement or the performance of the Services . . . ." (2003 Release ¶ 3). The parties also amended the Agreement ("the 2003 Amendment")[12] as part of the settlement. The amendment shifted the responsibility for maintenance and repair of the Facility from Veolia to SSAB. (2003 Amendment § 2.5). Veolia, however, remained the owner of the Facility and retained its obligations with respect to the operation of the Facility.

### C. Red Water and its Treatment

"Red water" is created when heated steel slabs are flattened by passing the slabs through rollers in the rolling mill. (Declaration of Steven Bell ("Bell Decl.") ¶¶ 6-7).[13] While the steel is in the rolling mill, it is sprayed with water to remove scale that forms on the surface of the hot metal, after which the spray water drains into an open flume and is channeled into the Facility, where it flows through a series of pits and basins and the solids suspended in the water are removed. (*Id*. ¶ 6). When certain grades of steel are sprayed in the rolling mill, it causes red-colored, microscopic particulate on the surface of the hot metal to be washed into the water and gives the water a red hue. (*Id*. ¶ 7).

---

[12] The 2003 Amendment is located at document 132-8.

[13] The Declaration of Stephen Bell is located at Doc. 70-9.

Although "there is always some red water when . . . steel" is made, (deposition of Paul Wilson on 9/10/18 ("Wilson Dep. I") at 56),[14] the costs associated with treating the red water became an issue between the parties beginning in 2005. (Wesselman Dep. at 106). At that time, the steel mill began manufacturing X-grade steel which had higher mechanical properties than other types of steel. (Kelley Dep. I at 107, 123). The manufacture of X-grade steel results in higher concentrations of fine iron oxides than other types of steel and, as such, produces more intense red water. (Wesselman Dep. at 72; Wilson Dep. I at 161-62).

In 2005 and 2006, increased red water incidents were sporadic, (Wesselman Dep. at 130), and Veolia, SSAB and ChemTreat, the chemical vendor, discussed treatment methods for the red water during their weekly meetings.[15] (Kelley Dep. I at 126-30, 135-37). The solution for treatment of the more intense red water was to add more chemicals to the process water, (*id*. at 125-27), but this solution was expensive. In early December 2005, during one of the weekly meetings, Veolia pointed out multiple costs that were keeping Veolia from maintaining their budget, including increased costs to treat red water. (Doc. 135-6). The plant manager for

---

[14] The deposition of Paul Wilson taken on 9/10/18 is located at Doc. 132-6.

[15] Veolia, SSAB and ChemTreat began holding weekly meetings in approximately 2004 to discuss water chemistry, water quality results, operations, maintenance, and capital improvements, among other topics. (Kelley Dep. I at 85, 97-101). The meetings continued through the end of 2015. (*Id*. at 85-86).

SSAB at the time "emphasized that [SSAB] [wa]s interested in looking for [a] technical solution[]" to the red water costs, as well as other costs, so overall treatment costs could be controlled. (*Id*.).

In 2007 and 2008, more concentrated red water was infrequent. (Wesselman Dep. at 130). In 2009, however, a large order of X-grade steel from SSAB caused red water for months. (*Id*. at 130-31). The concentrated red water was treated by adding additional chemicals, as well as renting equipment to aid in the treatment. (Kelley Dep. I at 166-68). The solution was expensive: in 2009 alone, Veolia incurred "over $1 million in chemical, labor, and equipment rental costs . . . ." (Bell Decl. ¶ 8). Not only was it expensive, but during this increase of red water, the parties continued to discuss different ways to handle its treatment.[16] (*See* Wesselman Dep. at 135; Doc. 135-8; Doc. 135-9).

In 2010 and 2011, the red water incidents again became more intermittent. (Kelley Dep. I at 154). Then, in mid-2012, the frequency of more concentrated red water again increased and continued for a prolonged period due to increased production of X-grade steel. (*Id*. at 154). In June 2012, SSAB and Veolia made the decision to bring in additional equipment to handle the increase of red water, just as they had in 2009. (Doc. 132-10). Veolia and ChemTreat also began using

---

[16] For example, in October 2009, Richard Hoyt, the area manager for Veolia, described the use of the chemicals to treat the red water as a "temporary solution" that was "not sustainable for a number of reasons." (Doc. 135-8). While the use of the chemicals kept the mill in compliance and "provide[d] reasonable quality water to the operating facility," Hoyt stated that the solution was "costly in terms of money outlay and personnel requirements." (*Id*.).

additional chemicals so that more of the fine iron oxide particles would settle out in the secondary pits before reaching the pressure filters. (Wesselman Dep. at 134-35; *see also* Kelley Dep. I at 217-18, 285-87).

From 2012 through November 2013, SSAB, Veolia and ChemTreat continued to develop and refine strategies for treating the red water and improving operations during increased periods of red water. (Kelley Dep. I. at 225). Those strategies included a chemical feed automation program. (*See id*. at 220-23). During this time period, however, Veolia continued to use increased chemicals to treat the instances of red water. SSAB internally questioned the use of the chemicals, but trusted the judgment of Veolia as "the expert" when it came to the water systems. (*See* Wilson Dep. I. at 48-50). SSAB, however, "took the position . . . that red water [wa]s a normal part of [the steel making] process . . . [and] these filters should take [care of the issue]" without having to use the additional chemicals and equipment which resulted in the added expenses. (*Id*. at 53-54, 58, 81).

In late 2012, SSAB independently retained HDR, Inc., an engineering company, to evaluate the entire water systems, including some areas that were not in Veolia's control, and determine how SSAB might "radically change[]" the process water system. (Wesselman Dep. at 258-60, 263; Wilson Dep. I at 79-80). In November 2013, HDR, Inc. concluded that the two 612 pumps could be

reprogrammed to work together in a way that would allow the filters to treat the more concentrated red water without using more chemicals to settle out the fine iron oxide in the secondary pits. (Wilson Dep. I at 297-99; Kelley Dep. I at 232). SSAB employed Deanna DeLucia to reprogram the pumps' controlling software. (Deposition of John Schubert ("Schubert Dep.")[17] at 129-30; Kelley Dep. I at 232-34, 234, 308). Once the pumps were reprogrammed, Veolia operated the Facility with this new protocol which did not require the use of the additional chemicals and equipment. (*See* Wilson Dep. I at 88-89).

### D. Payment for Increased Red Water Costs

Every time there was an increase in red water, the costs to treat it increased for Veolia. At the end of 2005, Veolia requested reimbursement from SSAB to cover the additional red water costs, as well as two other unrelated costs. (Deposition of Paul Wilson on 12/14/15 ("Wilson Dep. II")[18] at 87-89; Doc. 132-14 at 2). SSAB refused to pay for the increased costs associated with the red water because SSAB did not consider the red water costs reimbursable. (*Id*.). Veolia did not continue to request reimbursement for the 2005 costs because SSAB reimbursed it for the other costs and ChemTreat agreed to absorb some of the

---

[17] The deposition of John Schubert is located at Doc. 132-4.

[18] The second deposition of Paul Wilson, taken on December 14, 2015, is located at Doc. 132-13.

additional red water costs.  (Deposition of Steven Kruger ("Kruger Dep.") at 47, 125-26).[19]

At the end of 2009, Veolia again submitted an invoice to SSAB detailing additional red water costs and requested reimbursement.  (Kelley Dep. I at 179-80). SSAB and Veolia met to discuss the invoice and supporting documentation.  (*Id.* at 180-82).  After meeting, SSAB fully reimbursed Veolia for the costs.  (*Id.* at 182). The same thing occurred in 2010 and 2011: Veolia submitted an invoice at the end of the year for the additional costs associated with the increased red water and SSAB paid the invoice in full.  (*Id.* at 182-83).

In 2012, Veolia started invoicing SSAB monthly for the increased red water expenses.  (*Id.* at 183-84).  Before the invoice could be submitted, however, SSAB had to issue a purchase order to cover the additional red water costs.  (*Id.* at 193-94).  When a purchase order did not cover the next invoice, SSAB issued a new purchase order at Veolia's request.  (*Id.*).

Upon receipt of each monthly invoice, Scott Kelley, the primary contact between SSAB and Veolia, reviewed it and the supporting documentation and verified that the expenses invoiced were with the red water expenses.  (*Id.* at 184-85).  After Kelley looked at the invoices, Paul Wilson, Vice President of North America Operations at SSAB, reviewed the invoices, discussed them with Kelley

---

[19] The deposition of Steven Kruger is located at Doc. 132-12.

and others as needed,[20] and then approved payment. (Wilson Dep. I at 27-28, 34-41).

This general procedure of submitting monthly invoices for red water costs against previously issued purchase orders and SSAB's approval of the invoices and payment continued without objections through the end of the parties' relationship in 2015. Wilson testified, however, that SSAB had "no other option" than to pay the invoices because "we had to run the plant." (*Id*. at 44-45). When asked whether Wilson could have not approved Veolia's invoices, Wilson stated as follows:

> No, the water system has to run to run the plant. . . . So we had no other option other than to pay and run the plant. We kept asking the experts is this the only way you can do this? Is there a technical solution? Is there a mechanical solution? And that is what we kept asking, but we had to run the plant. The water system is an important part of that system. It has to run or you cannot operate the plant, and we had an expert running the water system.

(*Id*. at 45-46).

Additionally, internally SSAB questioned and disputed whether it was responsible for reimbursing Veolia for the additional red water costs. (Wilson Dep. I at 280). Specifically, in December 2013, SSAB began discussing whether it should make a claim for "back charges" against Veolia and instructed Kelley to

---

[20] Wilson testified that there were many discussions regarding how the red water was being treated and whether or not there were other options because it was so expensive to treat it with the chemicals and rental equipment. (Wilson Dep. I at 38).

compile the chemical and equipment costs associated with the red water that it had paid Veolia. (*Id.*; Doc. 132-15 at 2). Steve Palko, the corporate director of facility engineering for SSAB, prepared to draft deficiency notices, but they were never sent to Veolia. (Deposition of Steve Palko ("Palko Dep.")[21] at 34, 178-81; Doc. 132-17; Doc. 132-18).

The red water costs decreased after November 2013 with the change to the programming of the 612 pumps. (Kelley Dep. I at 135). Veolia continued to operate the Facility with the new programming until the Agreement terminated in 2015. (Wilson Dep. I at 89-92). The equipment rented for use in instances of increased red water remained as a precaution, however. (Kelley I. Dep. at 168-71, 237). SSAB continued to reimburse Veolia for the equipment rental costs until the relationship ended. (*Id.*).

### E. Termination of the Agreement by SSAB

In approximately April 2014, SSAB asked Veolia if it would be interested in participating in an update to the Facility. (Palko Dep. at 257). SSAB proposed that Veolia supply $24 million in new capital for the project, as well as refinance the $6 million termination fee due to Veolia at the end of the Agreement. (*Id.* at 257-58; Doc. 132-19 at 3-4). Veolia declined the offer. (Palko Dep. at 257-58; Doc. 132-19 at 2-3).

---

[21] The deposition of Steve Palko is located at Doc. 132-16.

On December 17, 2014, SSAB sent notice to Veolia that it would be terminating the Agreement at the end of its term[22] pursuant to the terms of the Agreement. (Doc. 132-20 at 2). Under the Agreement, SSAB had the option to "terminate this Agreement and acquire title to the Process Water Facility by paying all outstanding Charges and the applicable Termination Fee set forth in Schedule 14B specified and in accordance with section 9.7." (Agreement § 7.3(b)). Schedule 14B required SSAB to pay a $6 million termination fee at the end of the Agreement. (Agreement Schedule 14B).[23] SSAB also requested a meeting for January 2015 to determine the "parties' respective rights and obligations during the final year of the Agreement." (*Id.*).

Toward the end of the Agreement, on October 30, 2015, Wilson sent an email to Veolia in which SSAB claimed it incurred $13.7 million in excess costs during the parties' relationship. (Wilson Dep. II at 62-64). SSAB informed Veolia that they wanted to "sit down" and "come to a business decision on how those costs would be handled," including the $6 termination fee. (Wilson Dep. I. at 312-13). Veolia viewed this move as an attempt to renege on the termination fee, as well as an effort to exert pressure on Veolia by claiming that it was entitled to recover excess costs previously paid by SSAB. (See Doc. 131 at 15). As a

---

[22] The termination was effective as of 12:01 a.m. on January 1, 2016. (Doc. 132-20 at 2).

[23] Schedule 14B is located at pages 64-65 of Doc. 132-2.

result, Veolia filed the instant complaint to recover the $6 million termination fee. (*See* Doc. 1).

## IV. DISCUSSION

The remaining claims in the amended counterclaim sound in contract. Veolia makes six arguments in support of summary judgment.[24] First, Veolia argues that SSAB did not comply with the notice provisions of the Agreement. (Doc. 131 at 20-25). Veolia next contends that even assuming there was a breach of the Agreement, SSAB was not harmed by the alleged breach. (*Id*. at 25-27). Third, Veolia argues that the purchase orders modified the Agreement so that the red water costs were passed through Veolia and paid by SSAB. (*Id*. at 27-30). Fourth, Veolia asserts that the voluntary payment doctrine bars SSAB's claims. (*Id*. at 30-35). Fifth, Veolia argues SSAB waived its claim for breach of contract and should be equitably estopped from asserting it. (*Id*. at 35-37). Finally, Veolia contends the 2003 Release captures and bars SSAB's claims because red water was present from the beginning. (*Id*. at 39-41). The court addresses Veolia's first and fourth arguments and finds that both result in summary judgment in Veolia's favor on the counterclaims. The court does not address the remaining arguments.

---

[24] Veolia also contends that SSAB''s damages are limited to $500,000 under the contract. (Doc. 131 at 37-39). Because the court is granting summary judgment based on two other arguments, the court does not address this issue.

## A. SSAB's Failure to Comply with the Default Notice Provisions

To establish a claim for breach of contract under Alabama law, a plaintiff must show: "(1) the existence of a valid contract binding the parties in the action; (2) his own performance under the contract; (3) the defendant's nonperformance; and (4) damages." *City of Gadsden v. Harbin*, 148 So. 3d 690, 696 (Ala. 2013) (quoting *Ex parte Alfa Mut. Ins. Co.*, 799 So. 2d 957, 962 (Ala. 2001)). Veolia contends that SSAB's claims fail because SSAB cannot show its own performance under the Agreement because it did not notify Veolia of its alleged default. (Doc. 131 at 20-25). SSAB responds that it is excused from complying with the notice provisions because: (1) it would have been futile to comply; and (2) it was not possible to comply.[25] (Doc. 135 at 15-19).

Alabama law requires "[a] clear and unambiguous notice, timely given, and in the form prescribed by the contract . . . to the exercise of an option to terminate the contract." *Bd. of Water & Sewer Comm'rs of City of Mobile v. Bill Harbert Constr. Co.*, 27 So. 3d 1223, 1262 (Ala. 2009) (quoting 17B C.J.S. Contract § 446 (1994)). The Agreement defines "Event of Default" by Veolia, in pertinent part, as follows:

---

[25] SSAB also argues, presumably in the alternative, that it did give notice and an opportunity to cure to Veolia. (Doc. 135 at 20). SSAB does not, however, explain what the alleged notice was and certainly does not establish how that notice complies with the provisions of the Agreement. (*See id.*). The court assumes that SSAB is referring to the December 6, 2005 meeting (*see id.* at 8-9) as evidence of notice, but that notice does not strictly comply with the notice requirements contained in the Agreement.

[Veolia's] unexcused failure to keep and perform any obligation under this Agreement, which [Veolia] fails to remedy within 10 days after written notice thereof by [SSAB], unless such default cannot reasonably be remedied within such period but can be remedied within 30 days, in which event [Veolia] shall promptly commence to remedy such default and diligently continue to remedy such default thereafter to completion as soon as practicable and in any event within 30 days after such notice is given, provided that such failure has not been caused by [SSAB's] failure to fulfill its obligations set forth in this Agreement or [Veolia's] performance is not otherwise excused with Article 12.

(Agreement § 9.1(b)).  Under this provision, there can be no default by Veolia until (1) SSAB gives Veolia written notice of the alleged default and (2) Veolia fails to remedy that default within 10 days or within 30 days if the default cannot be reasonably remedied within the 10 days.  (*Id*.).  The Agreement further provides that notice must be given "in writing" by "personal delivery . . . to an officer . . . or by facsimile . . . ."  (Agreement § 13.12).

There is no evidence in the record that SSAB complied with the notice provision of the Agreement.  SSAB did not give any written notice to an officer by personal delivery or facsimile, as required.  As such, Veolia was never put on notice of any alleged default.  SSAB argues, however, that it was not required to give Veolia written notice because "it would have been impossible for Veolia to

provide the technical solution within 30 days."[26]  (Doc. 135 at 15).  The court disagrees.

Alabama law is thin, if not nonexistent, on the issue of futility in a circumstance like the one presented here.  The Alabama cases cited by SSAB in support of its position are not on point and certainly do not give the court a clear view of Alabama law on whether SSAB should be excused for its failure to comply with the contractual notice provisions.  That being said, there are cases from other states that are instructive on the issue.  Those cases illustrate that a party can be excused from a contractual notice of default provision when the party establishes that the default was incurable during the given period.  *See Cheung-Loon, LLC v. Cergon, Inc.*, 392 S.W.3d 738, 745 (Tex. App. – Dallas 2012) (citing *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 594-95 (Tex. 2008)); *L.K. Comstock & Co., Inc. v. United Eng'rs & Constructors, Inc.*, 800 F.2d 219, 232 (9th Cir. 1989) (evidence that defaulting party was "so far behind schedule" and "could not have cured its breaches within 48 hours" made the notice "a useless gesture"); *Hoppe v. Percheron Assocs., LLC*, 2012 WL 3135378, at * 6 (D. Colo. Aug. 1, 2012) ("both parties agree there was no way to cure the alleged default as Defendants would have been unable to obtain another upgrade construction permit to begin any sort

---

[26] SSAB also argues that it was impossible to comply with the notice provision because the original personnel listed in the Agreement were no longer involved in the project and Veolia did not inform SSAB of the people to contact.  (Doc. 135 at 18).  The record clearly belies this argument: SSAB contacted the correct person at Veolia when it gave notice to Veolia that it was exercising its right to terminate the Agreement.  (*See* Doc. 132-20 at 2).

of upgrading within the 15-day cure period"); *Reserves Dev., LLC v. R.T. Props.*, LLC, 2011 WL 4639817, at *7 (Del. Super. Ct. Sept. 22, 2011) ( "[t]he record . . . shows that written notice of a default on the infrastructure would not have led to agreement or compromise" where "[t]he issue had arisen on more than one occasion, the only result being . . . continued assurances that everything would be taken care of in due time.").

The problem for SSAB, however, is that it has not presented any *evidence* that would establish the futility of notifying Veolia of the alleged default. Instead, SSAB's brief makes the blanket statement that "it would have been impossible for Veolia to provide the technical solution [that complied with industry standards] within 30 days" without any citation to the record to support the statement. The Eleventh Circuit has expressly held that an attorney's argument in a brief "is not evidence." *Bryant v. United States Steel Corp.*, 428 F. App'x 895, 897 (11th Cir. 2011). The argument continues with a series of block quotes from cases where the futility exception was applied, but does not apply those cases to the evidence presented by the record here.

Notwithstanding the above, there is no evidence in the record to create a jury question on the issue of futility. Instead, the evidence shows that the opposite is true. The alleged default, characterized in multiple ways by SSAB in their brief in opposition to summary judgment, was ultimately cured when the pumps were

reprogrammed to reduce flow surges to the filters which led to their operation without the use of the additional chemicals and equipment. That solution was found as a result of a study by an outside firm retained to evaluate the water system. Granted, the entire study lasted approximately eleven months, but the study dealt with more than just the red water issues. There is no evidence as to how long it took to find the solution and reprogram the pumps, and the court refuses to speculate.

For the foregoing reasons, the court finds that SSAB did not strictly comply with the notice provisions of the Agreement and was not excused for the failure because of futility. "[W]hen a default clause contains a notice provision, it must be strictly followed, and summary judgment is warranted if notice is not given." *In re Colony Square Co*., 843 F.2d 479, 481 (11th Cir. 2919). Summary judgment, therefore, is due to be granted in favor of Veolia on the remaining claims in the counterclaim.

### B. The Voluntary Payment Doctrine

In the alternative, the court addresses Veolia's argument regarding the voluntary payment doctrine and finds it persuasive for the reasons stated below.

"It has been the law in Alabama for over 150 years that where one party, with full knowledge of all the facts, voluntarily pays money to satisfy the colorable legal demands of another, no action will lie to recover such a voluntary payment,

in the absence of fraud, duress, or extortion." *Stone v. Mellon Mortgage Co*., 771 So. 2d 451, 456 (Ala. 2000). A breach of contract claim is precluded by proof that the party asserting the claim voluntarily paid what he or she is seeking to recover. *Id*.; *see also Mt. Airy Ins. Co. v. Doe Law Firm*, 668 So. 2d 534, 537 (Ala. 1995). A "voluntary payment" is defined as "a payment made by a person of his own motion, without compulsion; a payment made without a mistake of fact or fraud, duress, coercion, or extortion, on a demand which is not enforceable against the payer." *Mt. Airy Ins. Co*., 668 So. 2d at 538 (quoting 70 C.J.S. Payment § 100 (1987)).

Veolia argues that "SSAB paid every single one of Veolia's invoices for additional chemicals, equipment, and labor and made capital expenditures in support of the process water facility all the while knowing full well what it was paying for and why it was paying for it." (Doc. 131 at 31). Further, Veolia contends there is no evidence of any type of fraud, duress, extortion or mistake that exempts the operation of the voluntary payment doctrine. (*Id*.). SSAB responds, however, that there is a question of fact as to whether the payments were voluntary because they were made under "business compulsion." (Doc. 135 at 22-26). More specifically, SSAB contends if it did not make the payments SSAB would have been forced to close the mill because Veolia would not have provided the

chemicals for free. (*Id*. at 23-25). The court disagrees with SSAB that the business compulsion exception applies to the facts presented.

"In order to recover money, paid under duress, it must be shown not only that there was duress, but also that the demand or duress was illegal, unjust, or oppressive and that it is against equity and good conscience for the payee to retain the money." *Standard Oil Co. of Ky. v. Grambling*, 160 So. 725, 726 (Ala. App. 1935). The doctrine of business compulsion "applies only to special, unusual, or extraordinary situations in which unjustified coercion is used to induce a contract, as where extortive measures are employed, or improper or unjustified demands are made, under such circumstances that the victim has little choice but to accede thereto." *Ralls v. First Fed. Sav. And Loan Ass'n of Andalusia*, 422 So.2d 764, 766 (Ala. 1982) (quoting 17 C.J.S. Contracts § 177 (1963)). The evidence does not fit this exception. Specifically, there is nothing in the record to even hint at any sort of coercion, extortion or improper or unjustified demands. There is also no evidence of any type of extraordinary or exigent circumstances. Instead, the record establishes that the parties, both sophisticated businesses, had a monthly routine for the issuance and payment of the increased red water invoices: first, Veolia invoiced[27] SSAB for the increased red water expenses, (Kelley Dep. I at 183-84);

---

[27] Before the invoice could be submitted, however, SSAB had to issue a purchase order to cover the additional red water costs. (Kelley Dep. I at 193-94). When a purchase order did not cover the next invoice, SSAB issued a new purchase order at Veolia's request. (*Id*.).

second, Scott Kelley reviewed the invoice and the supporting documentation and verified that the expenses invoiced were with the red water expenses, (*id*. at 183-85); finally, Paul Wilson, Vice President of North America Operations at SSAB, reviewed the invoices, discussed them with Kelley and others as needed, and approved payment, (Wilson Dep. I at 27-28, 34-41). This routine lasted for four years.

Although Wilson testified that the invoices had to be paid or SSAB would have been forced to shut down the mill, this testimony is pure speculation and unsupported by the record. In fact, in 2005, SSAB refused to pay for the additional costs associated with treating the increased red water that year and maintained that it was Veolia's responsibility. (Wilson Dep. II at 87-89). In response to the refusal, the mill was not shut down. Instead, Veolia worked out a business deal with ChemTreat. (Kruger Dep. at 47, 125-26). There is simply no way to know what Veolia would have done had SSAB given it the notice of default, as prescribed by the Agreement, and refused to pay the invoices for the increased red water costs.

In summary, the court concludes that SSAB's counterclaims are barred by the voluntary payment doctrine. The evidence establishes that SSAB made a deliberate business decision to pay the invoices each month for the increased costs associated with the red water. There is no evidence of duress or business

compulsion to preclude the application of the voluntary payment doctrine. Summary judgment, therefore, is due to be granted for this alternative reason on SSAB's remaining counterclaims.

## V. CONCLUSION

For the foregoing reasons, the court finds that the motion for summary judgment is due to be granted. A separate order will be entered.

**DATED,** this 24th day of June, 2019.

_John E. Ott_

**JOHN E. OTT**
Chief United States Magistrate Judge